UNITED STATES DISTRICT COURT
NORTHERN DISTRICT OF ILLINOIS
EASTERN DIVISION

| | |
|---|---|
| Mike Ortiz and Shelly Carnes, individually and on behalf of all others similarly situated, <br><br> Plaintiffs, <br><br> - against - <br><br> Sazerac Company, Inc., <br><br> Defendant | 1:23-cv-00097 <br><br><br> Hon. Mary M. Rowland |

**DECLARATION OF SPENCER SHEEHAN**

Pursuant to 28 U.S.C.§ 1746, I declare:

1. I was the attorney for Plaintiff Mike Ortiz ("Plaintiff Ortiz") and Shelly Carnes ("Plaintiff Carnes") (together, "Plaintiffs") in this action until its dismissal almost four months ago.

2. I have reviewed Defendant's Motion and Memorandum of Law in Support of Sanctions. ECF No. 24.

3. Defendant has insisted that Fireball Cinnamon is not sold in Illinois, relying on the Declaration of Jason Tondelli, Sazerac's State Manager for Illinois, ECF No. 10-3.

4. Defendant contends that Plaintiff's counsel filed the Amended Complaint, ECF No. 17, "despite knowing that Fireball Cinnamon is not sold in Illinois." Def. Mem. at 6.

5. While not directly relevant to the outcome of Defendant's Motion, I found it curious why it was filed three months after the case was closed.

6. On August 28, 2023, a fact checker for New Yorker magazine contacted Defendant's Counsel and asked him about specific facts related to the initial Fireball Complaint filed by Plaintiff Marquez.

7. I do not suspect that Defendant's Counsel ever responded to that fact checker, who

indicated her deadline was August 29, 2023.

8. However, when I saw Defendant's Motion for Sanctions filed on August 29, 2023, I realized the forthcoming article on the undersigned appeared to be the motivation for this late-filed Motion.

9. Finally, for the reasons indicated below, there is no inconsistency between Defendant's contentions that Fireball Cinnamon is not, to its knowledge, sold in Illinois, and the facts alleged on behalf of Plaintiff Ortiz.

I. **EXPERIENCE OF PLAINTIFF ORTIZ**

10. Plaintiff Ortiz saw media coverage of the Fireball lawsuit in this District.

11. On January 30, 2023, I received an email from Plaintiff Ortz seeking "more information about this class action lawsuit" regarding the deceptively labeled Fireball Cinnamon products.

12. Plaintiff Ortiz told me that "[he] live[s] on the Border of Illinois. In East Chicago, IN. I have bought the fireball cinnamon from multiple locations in Chicago and one in East Chicago, IN."

13. Since I had already been informed that Defendant does not officially sell Fireball Cinnamon in Illinois, I was initially skeptical of Plaintiff Ortiz's assertions that he bought this item in Illinois.

14. I informed him of Defendant's position regarding the sale of the Fireball Cinnamon in Illinois.

15. I spoke with Plaintiff Ortiz several times on the telephone in which he was consistent in the facts presented.

16. Plaintiff Ortiz was clear that he bought the Fireball Cinnamon "in Lansing, Calumet

City, and Burnham, [are] Illinois cities [] [J]ust south of Chicago."

17. When I questioned him again, he was adamant, responding, "No man. Cal city has sold me Cinnamon. Not the whiskey" in the fall of 2022. Am. Compl. ¶ 45.

18. When I asked Plaintiff Ortiz to go back to the Go Lo store and take pictures of the Fireball Cinnamon, he subsequently informed me it was no longer available there. Am. Compl. ¶ 46.

19. Since Plaintiff Ortiz was confident he purchased the Fireball Cinnamon, and because I knew reasonable consumers would genuinely confuse this with the Fireball Whisky, I sought to test his knowledge of the differences between them.

20. I was skeptical he would adequately be able to do this.

21. Had Plaintiff Ortiz been mistaken, it would have been a reasonable and honest mistake.

22. Plaintiff Ortiz confirmed he was aware of the two versions, by sending me the following pictures of each, sold at "the Citgo gas station 1312 West Chicago Avenue, East Chicago, Indiana." Am. Compl. ¶ 47.

 

23. This was sufficient for me to credit Mr. Ortiz's statements that he was aware of the two products and their subtle distinctions, intended to mislead consumers.

## II. KNOWLEDGE AND EXPERIENCE WITH CONVENIENCE STORES

24. After being satisfied with Plaintiff Ortiz's facts, I assembled my knowledge of convenience stores.

25. Gas station convenience stores are generally understood by the public to be places which sell "alcohol, cigarettes and lottery tickets," described as "vice" or "sin" products.

26. While I am not a sociologist, it is not difficult to connect the sale of such goods with social disorder.[1]

27. As a voracious consumer of news, I have been continually aware of media reports of

---

[1] Chelsea R. Singleton, et al. "County-level associations between food retailer availability and violent crime rate." BMC Public Health 22.1 (2022): 1-9.

4

illicit activity connected to convenience stores.

28. For instance, several years ago, numerous reports across the country revealed how "Local gas stations and convenience stores are selling suspicious merchandise."[2]

29. These items included "apparent drugs" such as "iBlown," a form of highly dangerous, synthetic marijuana ("K2"), "labeled as potpourri."

30. The reporter described the sale of "polos that don't appear legit, and name brand jeans sold on the cheap."

31. When store employees were confronted, "They played dumb. We showed them what they sold us; they outright denied it. Some employees avoided our cameras, and when we pressed the cashier he claimed a language barrier."

32. Similar stories were filed in Florida, where police "raided four convenience stores for selling synthetic drugs" and left with "49 black trash bags with brightly colored packages of the incense some with names like 'Mr. Nice Guy' and 'Scooby Snax'" and a cache of "Illegal weapons."[3]

33. Illinois has also experienced dozens of hospitalizations, including fatalities, which the Illinois Department of Public Health ("IDPH") attributed to "Synthetic cannabinoids [that] can be found throughout the state and U.S. in convenience stores [and] gas stations."[4]

34. Not far from this Court, former "Mayor Rahm Emanuel's administration [] beg[a]n targeting problem neighborhood businesses, focusing on liquor and convenience stores which inspectors contend cater to criminal activity."[5]

---

[2] ABC57 Staff, ABC57 News Investigation: Illegal goods sold at area corner stores? Nov 15, 2013.
[3] Jared Leone, Convenience Stores Busted For Selling K2, Patch.com, Jul 11, 2013.
[4] Kristen Thometz, 70 Cases of Severe Bleeding in Illinois Linked to Synthetic Marijuana Use, WTTW News, Apr. 3, 2018 (quoting Illinois Department of Public Health); U.S. Attorney's Office, Northern District of Illinois, Press Release, Three Individuals Charged with Federal Drug Offenses for Allegedly Conspiring to Sell Synthetic Cannabinoids at Chicago Convenience Store, Apr. 2, 2018.
[5] Phil Rogers, City Goes After Problem Businesses, NBC Chicago, July 9, 2012.

35. Other stories focus on convenience store owners "had [their] mercantile licenses revoked [] for illegal sales" of products such as "herbal supplements containing prescription-only drugs used to treat erectile dysfunction."[6]

36. One store owner indicated he was "unclear on some of the rules," asking, "'How would we know what's in it?' [] point[ing] to the ingredients listed on the enclosed paper, which included herbs but did not list any active prescription ingredients."

37. Perhaps the most significant illicit activity occurring at convenience stores is the sale of untaxed cigarettes.

38. This typically involves "buy[ing] contraband cigarettes in St. Louis, Missouri, a low tax market, and transport[ing] and distribut[ing] them in Chicago, Illinois and New Jersey, high tax markets."[7]

39. The alleged culprits "used several convenience stores which they owned or operated to create the appearance of legitimate cigarette purchases [with] Illegal profits from the contraband cigarette sales [] laundered through accounts associated with the convenience stores."

40. Across this State's borders in Missouri, authorities took down "convenience stores [that] were utilized to receive and sell stolen goods such as infant formula, computers, Global Positioning System devices, and cigarettes."[8]

41. The scheme was based on buying "stolen property at rates significantly below fair market retail value and sold the items through the convenience stores at a large profit."

42. None of the gas station convenience stores referred to in this Declaration had lawful

---

[6] Lynda Cohen, Atlantic City code enforcers say challenges are many when it comes to policing sales of local stores, Press of Atlantic City, Mar. 15, 2013.
[7] Withers Syndication, Chicago Ridge Man to Serve State, Federal Sentences on Cigarette Conspiracy, WMIX 94, Feb. 7, 2018; CSP Daily News, Cigarette-Tax Evasion Costs New York, Illinois Millions NYACS official urges enforcement; Cook County hires more investigators, Dec. 13, 2012.
[8] U.S. Attorney's Office, Eastern District of Missouri, Press Release, Eight Area Men Sentenced on Federal Racketeering Charges Involving Conspiracy to Transfer Cash and Checks to the Palestinian Territories, Apr. 1, 2010.

licenses to sell synthetic marijuana or untaxed cigarettes.

### III. DEFENDANT'S FOCUS ON "TRADITIONAL" DISTRIBUTION OVERLOOKS "GRAY MARKET"

43. While Defendant asserts the store in question did not have a liquor license and focuses on the sale of Fireball Cinnamon in the "traditional market," my background knowledge, coupled with independent research into alternative distribution networks supported the allegations made by Plaintiff Ortiz.

44. Specifically, what Plaintiff Ortiz described to me, the sale of Fireball Cinnamon at an unauthorized location, fit comfortably into what academics refer to as the "gray market."

45. "Gray markets" involve the sale of legitimate, non-counterfeit and non-illicit products that "are diverted from their traditional channels of distribution," "occupy[ing] a position between black markets and traditional markets."[9]

46. An official with the Drug Enforcement Administration ("DEA") described how "The traditional market, [is] characterized by a short distribution chain from manufacturer to distributor to retailer, [and] typically includes large chain grocery stores, chain pharmacies, large convenience stores and large discount stores." [10]

47. In contrast, "The gray market is characterized by additional layers of distribution and includes such non-traditional retailers as small convenience stores, [and] gas stations."[11]

48. That there would exist a "gray market" for the sale of Fireball Cinnamon mini bottles was not surprising to me, based on the popularity of the Fireball Whiskey brand.

---

[9] Larry Lowe and Kevin McCrohan, "Gray markets in the United States," Journal of Consumer Marketing, 5.1 (1988): 45-51; Shelley Raina, The Top Five Unintended Consequences of the Gray Market, Forbes, Aug. 25, 2022; 3NG Consulting, Dealer Marketplace, Industry Data, What is gray market and how is it different from black market?, June 27, 2022.
[10] 70 Fed. Reg. 33,195, 33,196-33,197, Joy's Ideas, Revocation of Registration, June 7, 2005, Drug Enforcement Administration.
[11] 70 Fed. Reg. 33,195, at 33,197.

49. While alcoholic beverages are often described as being subject to a strict "three-tier system distribution," because "each state [is] regulating liquor differently and operating independently of each other, it is impossible to monitor interstate shipments, mail order businesses, and ever increasing ways of moving alcoholic beverages."[12]

50. In considering the facts described to me by Plaintiff Ortiz, I extensively investigated gray markets for consumer products.

51. I learned that "There are [] three types of gray markets."[13]

52. Relevant to the present facts were "Domestic Distributor Diversion ('DDD') channels," which "involve[s] a U.S. distributor selling to unauthorized resellers, thus expanding the channel."

53. The vulnerability to this type of gray market has affected a range of companies, including "IBM [which] found many of its Value Added Distributors were selling PCs to unauthorized retailers."

54. According to Lowe and McCrohan, "DDD channels emerge when nonauthorized resellers obtain a product that has high consumer demand. The product may be a high margin item, a traffic builder, or a status item that lends prestige to the gray marketer's line."

55. These criteria matched what I knew and discovered about the Fireball Cinnamon.

56. First, it was a "high margin item" because it substituted a lower quality and lower priced malt beverage base for whiskey.

57. Second, that it was a "traffic builder" for stores was confirmed by its "surge in popularity over the last few years, overtaking Jameson Irish Whiskey, Patron tequila, and even

---

[12] Gerald C. Langlais, Director, Connecticut Department of Consumer Protection, to Patrick J. McCormack, Minnesota Senate Counsel & Research, Nov. 3, 1995.
[13] Larry Lowe and Kevin McCrohan, "Gray markets in the United States," Journal of Consumer Marketing, 5.1 (1988): 45-51.

8

Jägermeister in U.S. sales volume."[14]

58. Third, high demand for all things Fireball would "lend[] prestige to the gray marketer's line."

59. Additionally, because "diverting distributors increase their volume and gray market resellers obtain sales [and] Manufacturer volume is increased with no loss in margin; thus there is little incentive for manufacturer action."

60. That a Fortune 500 company like IBM, founded on advanced technology, was unable to prevent the diversion of its advanced computers into the "gray market," supported my belief that no nationwide distribution network, especially for alcoholic beverages, where laws differ on a city, county and state level, could be so airtight as to prevent any sale in unauthorized channels.

61. The positioning of Fireball Cinnamon at a gas station convenience store, typically on the counter near the register, meant that it did not require permanent display cases or added investment to sell.

62. This contrasts with the sale of perishable products such as ice cream or frozen foods.

63. The conclusion I drew was that the Fireball Cinnamon could be displayed for sale with minimal effort and easily removed in advance of any unannounced inspection by authorities.

64. That Plaintiff Ortiz no longer saw the Fireball Cinnamon at that specific store after fall 2022 appears to indicate that "traditional channel resellers, or collective resellers acting in consortium through a trade association, [] force[d] channel discipline."

**IV. CONCLUSION**

65. In filing the Amended Complaint, "to the best of [my] knowledge, information, and

---

[14] Drew DiSabatino, How Did Fireball Whisky Become One of the Most Popular Drinks in America?, Bravo TV, Top Chef Blogs, Nov. 2, 2017.

belief, formed after an inquiry reasonable under the circumstances," I accepted "the factual contentions [that Plaintiff Ortiz bought the Fireball Cinnamon in Illinois] ha[d] evidentiary support." Fed. R. Civ P. 11(b)(3).

66. This would include his testimony, which was knowledgeable, consistent, and specific, including his awareness of the two Fireball versions.

67. This also included, based on my research, the prevalence of gray market products, the popularity of the Fireball brand, and the unfortunate though not unjustified belief that a gas station convenience store was likely the type of place to sell a product it was not permitted by law to sell.

68. Moreover, I believe, "to the best of [my] knowledge, information, and belief, formed after an inquiry reasonable under the circumstances," that the sale of Fireball Cinnamon in the "gray market" "w[ould] likely have evidentiary support after a reasonable opportunity for further investigation or discovery." Fed. R. Civ P. 11(b)(3).

69. This would include reviewing all of Defendant's supplier agreements and accounting for all inventory from the time after production until sold to the end purchaser.

70. That Plaintiff's Counsel has "deni[ed] [] factual contentions" advanced by Defendant, was, and remains, "to the best of [my] knowledge, information, and belief, formed after an inquiry reasonable under the circumstances," "warranted on the evidence." Fed. R. Civ P. 11(b)(4).

71. This includes the specificity and consistency of Plaintiff's Ortiz's statements to me, his awareness of the differences between the two Fireball products, and the alleged sale of the Fireball Cinnamon in the "gray market" of convenience stores and gas stations.

72. With this background awareness of how convenience stores often knowingly, or even

unknowingly, traffic in unauthorized or outright illegal products, Plaintiff Ortiz's reports to me had a high degree of merit.

73. Plaintiff Ortiz had no reason to tell me a story that was intentionally wrong.

74. I filed a Notice of Voluntary Dismissal on behalf of Plaintiffs because I believe this was, and is, a significant case of consumer deception.

75. By focusing on the particular facts of whether Plaintiff Ortiz could have bought the Product in this State, there would be less focus on the substantive issues, which one court already concluded could mislead consumers.

Under penalties of perjury, I declare that I have read the foregoing and that the facts stated in it are true, to the best of my knowledge and belief.

I declare under penalty of perjury that the foregoing is true and correct.

Executed on    September 21, 2023

/s/ Spencer Sheehan
Spencer Sheehan

11